UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION<br><br>                      Plaintiff,<br><br>v.<br><br>ARMEN TEMURIAN and VISTA NETWORK TECHNOLOGIES<br><br>                      Defendants. | Civil Action No. [    ]<br><br>ECF Case<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission (the "CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

**I. SUMMARY**

1. From at least September 2017 through January 2018 (the "Relevant Period"), Armen Temurian ("Temurian") and his company, Vista Network Technologies ("Vista") (Temurian and Vista together, "Defendants"), and others acting on their behalf or under their control, engaged in a scheme whereby they intentionally and/or recklessly made false or misleading material representations or disseminated false or misleading material information to the retail public in connection with the sale of digital assets that are commodities, such as Bitcoin and Ether.

2. Specifically, Temurian and Vista fraudulently induced retail investors (the "Digital Asset Commodity Investors") to transfer Bitcoin and Ether to Vista by falsely promising

1

that Vista would trade those digital assets and that the Investors would earn a 2.5% daily return on their investment and/or that their digital assets would double in value within 80 days.

3. Defendants directed Digital Asset Commodity Investors to transfer their Bitcoin and Ether to certain digital wallets controlled by Vista. As a result, the Investors transferred over 750 Bitcoin and 2,000 Ether—during the Relevant Period, worth over $6,000,000 and $1,000,000, respectively—to those digital wallets.

4. Defendants acted intentionally or recklessly in falsely guaranteeing profits to their Digital Asset Commodity Investors because at the time such promises were made, Defendants did not have any reason to believe Temurian or Vista was capable of earning such profits. Further, neither Temurian, nor Vista, actually traded any digital assets on behalf of investors.

5. Instead, Defendants' course of conduct had characteristics of a Ponzi scheme. Specifically, according to Defendants' own statements and records (viewed in conjunction with public blockchain information), while early Digital Asset Commodity Investors may have been paid back—or even paid profits—many later Digital Asset Commodity Investors did not receive any profits or even their entire original principal. At least some did not receive any assets back at all.

6. Indeed, consistent with a Ponzi scheme, Defendants' own statements and records (reviewed in conjunction with public blockchain information) reflect that new investor funds were used to pay old investors.

7. Therefore, in addition to fraudulently soliciting investor funds, Defendants also misappropriated certain investors' digital assets (together, the "Digital Asset Commodity Scheme") by using these assets for purposes other than what Investors intended.

8. Moreover, in early 2018, some Digital Asset Commodity Investors started to question why they were not seeing the promised return. Around this time, Temurian and Vista offered investors a different opportunity: to buy from Vista a "mini-miner." Temurian and Vista claimed that the "mini-miner" could mine digital assets—including Bitcoin—from users' home. This was also false. And Defendants knew it at the time and/or were reckless in not knowing it at the time.

9. Through the Digital Asset Commodity Scheme, Temurian and Vista engaged in acts and practices which violated the Commodity Exchange Act ("Act"), including Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1, 17 C.F.R. 180.1.

10. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, or in similar acts and practices. Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and Regulations. In addition, the Commission seeks restitution, civil monetary penalties, permanent trading and registration bans, and such other statutory, injunctive, or equitable relief as this Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C § 1345, which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or

practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

12. Certain digital assets, including Bitcoin and Ether, are "commodities" in interstate commerce.

13. Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Temurian and Vista transacted business in this District.

### III. THE PARTIES

14. **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder. The Commission maintains its principal office at 1155 21st Street NW, Washington, DC 20581.

15. **Defendant Armen Temurian** is a resident of Glendale, California and has never been registered with the Commission.

16. **Defendant Vista Network Technologies** had its principal place of business in Glendale, California and it has never been registered with the Commission.

### IV. FACTS

*Defendants' Digital Asset Commodity Scheme*

17. Temurian co-founded Vista in mid-2017.

18. Since its inception, Temurian has been the CEO of Vista.

19. By August of 2017, Defendants, or individuals they controlled, created and launched a website: http://vista.network ("the Website").

20. Defendants controlled the content of the Website.

21. The Website, in pertinent part, said: "Double Your Bitcoin and Your Ethereum Within 80 Days."

22. The Website further stated that "trading robots will trade every hour and will share their earnings with you as they deposit into your BTC and ETH WALLETS."

23. Under an "Opportunity" tab on the Website, Vista claimed "years of experience in the crypto mining and trading world."

24. Furthermore, in a list of benefits on the Website, it stated "Daily 2.5% -- Double in Just 80 days (ROI)," and that the goal was to double "as soon as possible."

25. In a "Vista PowerPoint" tab on the Website, a PowerPoint about Vista was available for download in multiple languages, including English ("Vista PowerPoint").

26. The Vista PowerPoint was created in July 2017.

27. Specifically, the Vista PowerPoint repeated the false claim: "Double your Bitcoin and your Ethereum within 80 days or less through an automated Dual Coin Platform." Defendants acted intentionally or recklessly in making this false claim because at the time such claim was made, Defendants did not have any reason to believe Temurian or Vista was capable of doubling Bitcoin or Ethereum within 80 days or less.

28. The Vista PowerPoint claimed "Robot Traders" were part of Vista's business model.

29. The Vista PowerPoint reiterated the false claim: "Daily 2.5% - Double in Just 80 days (ROI)" claim.

30. It further claimed that Vista could "trade multiple times per hour even in minutes every single day."

31. Furthermore, the Vista PowerPoint explained that investors could choose from a variety of investment "Packages," depending on how much Bitcoin or Ether they chose to invest and additionally stated: "all packages 2.5% daily."

32. Both the Website and the Vista PowerPoint were designed to fraudulently induce Digital Asset Commodity Investors to believe that they would earn a 2.5% fixed daily return by having Defendants trade their digital assets.

33. For example, a Digital Asset Commodity Investor residing in this District viewed the Website and, relying on its fraudulent guarantees of trading and daily profits, transferred digital asset commodities to wallets controlled by Vista.

34. In addition to the content on the Website and in the Vista PowerPoint, Temurian personally marketed Vista to potential Digital Asset Commodity Investors located both in the United States and abroad in order to induce them to transfer their Bitcoin and Ether to Vista for purported trading.

35. Specifically, in or about late 2017, Temurian invited potential Digital Asset Commodity Investors to Vista's offices in Glendale, California.

36. At Vista's offices in Glendale, Temurian spoke directly to potential Digital Asset Commodity Investors and falsely represented to them that they would earn a fixed return on their digital assets by investing with Vista.

37. Defendants acted intentionally or recklessly in making this false representation because at the time such representation was made, Defendants did not have any reason to believe Temurian or Vista was capable of guaranteeing a fixed return on their Digital Asset Commodity investment.

38. Temurian and Vista also relied on a network marketing model to further perpetrate the Digital Asset Commodity Scheme.

39. Specifically, Defendants relied on a network of individual marketers to solicit investors ("Network Marketers"). Defendants purported to compensate these Network Marketers by offering them a fraction of the value of the Bitcoin or Ether transferred to Vista by the Digital Asset Commodity Investors that they recruited to invest with Vista.

40. Defendants disseminated the Vista PowerPoint to the Network Marketers. In turn, the Network Marketers used the Vista PowerPoint and the false profit representations therein to induce Investors to transfer Bitcoin or Ether to wallets controlled by Temurian and Vista.

41. Temurian was aware of, and sometimes monitored these efforts.

42. At times he joined in them. For example, a Network Marketer ("Marketer A") posted a video on YouTube on or about December 17, 2017, in which he used the Vista PowerPoint to market Vista to potential Digital Asset Commodity Investors. More specifically, Marketer A repeated the misrepresentations that Vista was trading all the time, utilizing bots, and that investors would earn 2.5% a day. Temurian appeared in this YouTube video via livestream after the PowerPoint presentation.

43. A second marketer website, called "vistanetworkusa.com," posted a video on or around November 2017, parroting language from the Website and PowerPoint regarding "doubling your bitcoin" and "daily 2.5%" payments, and showing potential investors how to transfer their Bitcoin or Ether to Vista.

44. On or about January 6, 2018, Temurian appeared in another video hosted by Marketer A—and posted on the "vistanetworkusa.com" website—which gave updates about Vista. In the video, Temurian reiterated the false claim that Vista does "trading."

45. In that video, Temurian also explained that Vista would *no longer* use the phrase "fixed return" or "fixed benefits of 2.5." Instead, he said, Vista would make everything variable "from 1/4 percent up to 2.5 percent . . . that's going to be how we run the daily benefits."

*Investors Transfer Millions of Dollars' Worth of Bitcoin and Ether to Plaintiffs*

46. From September 2017 through January 2018, Digital Asset Commodity Investors transferred Bitcoin or Ether to wallets controlled by Temurian and Vista.

47. In total, during the Relevant Period, Temurian and Vista collected over 750 Bitcoin (worth over $6,200,000 at the time such Bitcoin was deposited) and over 2,000 Ether (worth over $1,000,000 at the time such Ether was deposited) from their Digital Asset Commodity Investors.

48. Of these totals, approximately 165 Bitcoin (worth over $1,300,000) and 800 Ether (worth approximately $350,000) came from Digital Asset Commodity Investors located in the United States.

49. Indeed, hundreds of U.S.-based investors from around the country, including residents of this District, transferred Bitcoin or Ether to wallets controlled by Vista and Temurian.

*Defendants' Representations Were False*

50. Contrary to the representations made by Temurian and Vista, neither Temurian nor Vista ever traded Bitcoin or Ether on behalf of Vista's Digital Asset Commodity Investors.

51. Vista did not have a trading robot or other algorithm capable of generating a 2.5% daily return for Vista's investors.

52. At the time that Defendants represented to Digital Asset Commodity Investors that Vista would earn a "2.5% daily return" and "double" their money in 80 days, Defendants knew or were reckless in not knowing that these representations were false and that that neither he nor Vista had any trading program capable of achieving such fixed returns.

53. In the January 6, 2018 video referenced above, Temurian claimed that Vista "do[es] trading," knowing that Vista at that time was not trading—and had not traded—Digital Asset Commodities for Investors.

54. In that same video, Temurian had no basis to represent that Vista would be able to generate any daily returns for investors.

55. Indeed, on September 6, 2022, testifying under oath to Commission staff in this matter, entitled "In the Matter of Vista Network Technologies and Armen Temurian," Temurian admitted that "Vista never traded for customers."

*Misappropriation of Investor Assets*

56. In addition to Temurian's September 6, 2022 admission that Vista never traded for Investors, Vista's transaction records do not reflect any trading. Rather, Vista's movement of digital assets has characteristics of a Ponzi scheme.

57. Vista's records and public information, taken together, reflect that many Investors' digital assets sat in Vista-controlled wallets until they were bundled together and then split up into hundreds of small amounts—usually less than one hundredth of one Bitcoin. According to Vista's records, most of these small amounts were deposited into wallets belonging

9

to other investors; other amounts, however, end up in wallets not identified by Vista as belonging to an investor.

58. For example, Vista records (viewed in conjunction with public blockchain information) reflect that several U.S.-based investments made in late September 2017 sat in Vista-controlled wallets until November 21, 2017, when they were grouped together with other investors' digital assets into a 33 Bitcoin[1] transfer to another wallet. Ten of those Bitcoin were then used to make hundreds of small payments on November 21. And another 10 Bitcoin were used to make hundreds of small payments on November 23rd. According to Vista's records, these hundreds of small payments went to earlier investors; but other portions of the original 33 Bitcoin bundle were routed elsewhere.

59. Other U.S.-based investors' digital assets were turned around to repay other investors more quickly.

60. For example, on December 12, 2017, Investor A, based in the U.S., transferred 0.7 Bitcoin into a wallet controlled by Vista. At the time, 0.7 Bitcoin was worth nearly $12,000.

61. The next day, December 13, 2017, that 0.7 Bitcoin, together with over a dozen other investors' Bitcoin, was transferred through two different wallets, and then disseminated in small amounts to dozens, if not hundreds, of other wallets. According to Vista's records, some of the wallets receiving these small amounts belonged to investors who had deposited bitcoin with Vista prior to December 2017.

62. Investor A only ever received 0.1 BTC back.

---

[1] At the time, 33 BTC was worth approximately $264,000.

63. On December 19, 2017, Investor B, based in the U.S., transferred 0.5 Bitcoin, worth over $9,000 at the time, into a wallet controlled by Vista. No Bitcoin was every returned to him.

*The MiniMiner*

64. By early 2018, certain Digital Asset Commodity Investors who were fraudulently induced to transfer their digital assets to Vista based on the false promise of profits complained to Vista that they had not received their promised gains.

65. Around this time, Defendants urged Digital Asset Commodity Investors to continue investing with Vista in order to recoup their investment and more. As part of this effort, Defendants solicited Digital Asset Commodity Investors to purchase a new product, called a "mini-miner." Defendants promised Investors that this "mini-miner" would generate consistent revenue by mining Bitcoin, among other digital assets.

66. To market the mini-miner, Temurian and Vista created another website, "vistalive.com" in early 2018 ("VistaLive website").

67. The VistaLive website contained videos with representations about the mini-miner.

68. Specifically, one such video said that purchasers of the mini-miner could use it to "mine the cryptocurrency of your choice."

69. In the YouTube video described in paragraph 42, above, dated December 17, 2017, Temurian said that Vista had started developing its own commercial mining machines. He said that these machines "will mine Bitcoin and some other coins like Etherium . . . ."

11

70. On the VistaLive website in 2018, another video featured an interview with the purported developer of the mini-miner, who also claimed that the mini-miner could mine Bitcoin.

71. In fact, the mini-miner could not mine Bitcoin or Ether. And Temurian knew or was reckless in not knowing that it could not mine Bitcoin or Ether.

72. Specifically, the developer of the mini-miner told Temurian in late 2017 that he was developing the mini-miner to mine only another digital asset called Monero.

73. Temurian was also aware in late 2017 and early 2018 that the developer was having difficulty getting the mini-miner even to mine Monero.

74. Nevertheless, Temurian and Vista marketed the mini-miner as a functional product that could mine multiple digital assets and sold hundreds of mini-miners anyway.

## COUNT I

**Violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1(a) (2022)**
**(Employment of Deceptive Devices; Misappropriation)**

75. The allegations set forth in paragraphs 1 to 63 are re-alleged and incorporated herein by reference.

76. 7 U.S.C. § 9(1) makes it unlawful "for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . ."

77. 17 C.F.R. § 180.1(a) makes it "unlawful for any person, directly or indirectly, in connection with any swap or contract of sale of any commodity in interstate commerce, or

contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

78. Digital assets such as Bitcoin and Ether are encompassed in the definition of a "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9), and contracts for their sale are subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

79. From at least mid-2017 through mid-2018, as described above, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by, among other things, in connection with contracts of sale of commodities in interstate commerce, using or employing, or attempting to use or employ, a scheme or artifice to defraud, or making misrepresentations and omissions of material fact to current and prospective Digital Asset Commodity Investors, including, among other things, falsely promising that Vista would trade Bitcoin and Ether that had been deposited by investors, falsely guaranteeing profitable returns that they would receive from Defendants trading their Digital Asset Commodities, and misappropriating investors' assets, including payments of investors' funds to other investors consistent with a Ponzi scheme.

80. The misleading statements alleged above were material, as they related directly to investment profit and risk of loss.

81. By the foregoing conduct, Defendants directly or indirectly used or employed, or attempted to use or employ, a manipulative or deceptive device or contrivance or manipulative

13

device, scheme, or artifice to defraud customers and engaged in this conduct intentionally or recklessly.

82. By the foregoing conduct, the Defendants directly or indirectly used or employed, or attempted to use or employ, a manipulative or deceptive device or contrivance which made or attempted to make untrue or misleading statements of material facts or omitted to state material facts necessary in order to make their statements to customers not untrue or misleading, and engaged in such conduct intentionally or recklessly.

83. By the foregoing conduct, the Defendants directly or indirectly used or employed, or attempted to use or employ, a manipulative or deceptive device or contrivance or engaged or attempted to engage in an act, practice, or course of business which operated or would operate as a fraud or deceit, and engaged in such conduct intentionally or recklessly.

84. Defendant Temurian is a controlling person of Vista and failed to act in good faith, or knowingly induced, directly or indirectly, Vista's violations alleged in this Count. Accordingly, Defendant Temurian is liable for each and every violation of the Act committed by Vista, pursuant to 7 U.S.C. § 13(b).

85. Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act of such individual, association, partnership, corporation, or trust." Because the acts, omissions and failures of Temurian, the CEO of Vista, the Network Marketers and others acting on the behalf or under their control of Vista, that violated Regulation 180.1 were within the scope of their employment or office, Vista is liable for those acts constituting violations pursuant to Section 2(a)(1)(B).

**RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Find that Defendants Temurian and Vista violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1, 17 C.F.R. 180.1;

B. Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above—specifically, the use of any manipulative or deceptive device, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1, 17 C.F.R. 180.1.;

C. Enter an order of permanent injunction restraining and enjoining Temurian and Vista, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital assets that are commodities, as that term is described herein, for their own personal accounts(s) or for any accounts in which any Defendant has a direct or indirect interest;

3) Having any commodity interests or digital assets that are commodities, as that

  term is described herein, traded on any Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities, as that term is described herein;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests or digital assets that are commodities, as that term is described herein;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

  D.  Enter an order directing Temurian and Vista, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

  E.  Enter an order requiring Temurian and Vista, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the

violations described herein, including pre-judgment and post-judgment interest;

      F.    Enter an order directing Temurian and Vista to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599–600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein;

      G.    Enter an order requiring Temurian and Vista to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

      H.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 15, 2023

                        Respectfully submitted,
                        COMMODITY FUTURES TRADING COMMISSION

                        Manal M. Sultan
                        Deputy Director

                        By: /s/Samuel Wasserman
                            Samuel Wasserman
                            Katherine Rasor
                        Division of Enforcement
                        290 Broadway, 6th Floor
                        New York, New York 10007
                        Phone: (646) 746-9700
                        Fax: (646) 746-9939